# United States Court of Appeals

## For the First Circuit

No. 03-1189

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN T. MARSHALL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Boudin, Circuit Judge,

Siler,[*] Senior Circuit Judge,

and Lynch, Circuit Judge.

Thomas P. Colantuono, United States Attorney, with whom Helen White Fitzgibbon and Donald Feith, Assistant United States Attorneys, were on brief for appellee.

William T. Boyle was on brief for defendant, appellant.

October 29, 2003

---

[*]Of the Sixth Circuit Court of Appeals, sitting by designation.

**SILER**, <u>Senior Circuit Judge</u>.  Defendant-Appellant John T. Marshall appeals the district court's denial of his motion to suppress child pornography seized at his residence.  For the reasons that follow, the judgment of the district court is **affirmed**.

## I.  BACKGROUND

On February 5, 2002, Police Officer Christopher Hutchins responded to a call from Ms. Geis, owner of the residence at 7 Dixon Avenue in Newfields, New Hampshire.  When Officer Hutchins arrived, Geis informed him that she rented the two upstairs bedrooms of her home to John Marshall and Kathleen Jones.  She informed Officer Hutchins that Marshall had been arrested on burglary charges and was concerned that he might have stored stolen property on the premises.

Geis asked Officer Hutchins to search the upstairs apartment to look for stolen items, but he told her that he could not search the apartment without a warrant because Marshall and Jones had a right to their privacy.  At Geis's request, however, Officer Hutchins walked to the top of the stairs leading to the apartment and observed that one of the doors was ajar.  Through the opening in the door, he saw a black bag with a camera sticking out of it. He took one step into the room and saw that the camera was a Sony, which was consistent with the camera stolen from a nearby home.  At that point, Officer Hutchins asked a fellow police officer to

-2-

secure the premises while he went to the police station to prepare an affidavit in support of an application for a search warrant.

Jones arrived at the apartment while Officer Stevens was securing the residence. She asked to enter her apartment to gather some personal effects so that she could tend to her sick child who was staying at his father's home. Officer Stevens told Jones that she would not be allowed to enter her apartment because a search warrant was being sought as part of a police investigation into several area burglaries. Jones confessed that she knew that Marshall had been involved with the stolen property, but stated that she had no involvement in any burglaries and indicated that she wanted to cooperate with the police. Although Officer Stevens did not have a blank copy of a consent form with him, Jones stated that she would grant permission for a search of her apartment.

Soon thereafter, Officer Lamontagne arrived at the scene with a consent to search form, whereupon he advised Jones that she could leave the premises if she wanted, but told her that "it would be in her best interest to stay, that she could stop the consent search at any time, and that she should observe what was going on." Officer Stevens then read the consent to search form in its entirety to Jones. Jones signed the consent form, which gave the police permission to "take from my premises any property, any letters, papers, material to any other property or things which they desire as evidence for criminal prosecution in the case or

cases under investigation." Officers Stevens and Lamontagne reiterated that she could stop the search at any time.

Upon his return to the residence, Officer Hutchins asked Jones if she voluntarily gave her consent to search the premises, without being threatened or coerced. She replied yes. Officer Hutchins then had Jones add his name to the consent to search form and advised her that she could revoke her consent at any time. Although Officer Hutchins again urged her to remain on the premises, Jones left.

The officers proceeded with the search and recovered stolen social security cards, $3,400 in cash, United States Savings Bonds, two video cameras, and several videotapes. Officer Stevens viewed the videotapes using the VCR and television in the apartment. One of the videotapes depicted a naked female child exiting the shower, modeling various outfits, and wrestling with the defendant. The videotape also showed a man using the same child's hand to masturbate an adult male and contained scenes of the child being digitally penetrated by a man believed to be Marshall.

Marshall was later indicted on charges of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and (d) and 2256, and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). He subsequently filed a motion to suppress the videotape, arguing that Geis lacked authority to consent to the search of the stairwell and that Jones's consent was coerced.

-4-

Marshall further argued that the officers exceeded the scope of the search when they viewed the videotapes.

Following an evidentiary hearing, the district court denied the motion to suppress. It concluded that Geis had the authority to consent to the search of the stairwell leading to Marshall's apartment because it was a common area. It also found that Jones knowingly and voluntarily consented to the search of the upstairs bedrooms. Additionally, it determined that the officers acted reasonably by viewing the tapes and, therefore, did not exceed the scope of the consent. Marshall entered a conditional plea of guilty to one count of production of child pornography and was sentenced to a term of seventeen years.

## II. ANALYSIS

This court reviews a district court's legal conclusions involved in denying a motion to suppress the evidence *de novo*, and its findings of fact for clear error. United States v. Ngai Man Lee, 317 F.3d 26, 29-30 (1st Cir. 2003). The district court's credibility findings should be accorded deference and overturned only if this court has a definite and firm conviction that a mistake has been committed. United States v. Nee, 261 F.3d 79, 84 (1st Cir. 2001).

## A. Consent to Search the Stairway

Marshall challenges the district court's determination that Geis had the authority to consent to Officer Hutchins's search of

the stairway leading to the rooms he and Jones rented.  He argues that Geis lacked authority to give Hutchins permission to enter the stairwell and, as a consequence, the videotapes obtained from the search should be suppressed as fruit of the poisonous tree.  See generally Wong Sun v. United States, 371 U.S. 471 (1963).

In ruling on the motion to suppress, the district court found that the stairway and landing were common areas of the home and concluded that any one of its residents, Geis included, could have consented to a search of those areas.  See United States v. Matlock, 415 U.S. 164, 170 (1974) ("[C]onsent of one who possesses common authority over the premises or effects is valid against the absent, non-consenting person with whom that authority is shared."); United States v. Hyson, 721 F.2d 856, 859 n.7 (1st Cir. 1983) (holding that consent based on common authority "rests [] on mutual use of the property by persons generally having joint access or control for most purposes").  In support of its ruling, the district court cited the following:  (1) Geis told Officer Hutchins that she rented the two upstairs bedrooms to Kathleen Jones and John Marshall; (2) Geis did not specifically tell Officer Hutchins that she considered the stairway to be her tenants' space; (3) Geis never completely removed her personal property from the rented rooms; and (4) Geis had gone upstairs on occasions to get something she needed.

Marshall nevertheless argues that the district court erred in finding the stairwell to be a common area, given Geis's testimony that she considered the hallway up to the second floor to be her tenants' personal space. The district court considered this testimony, but credited the testimony of the officers over the testimony of Geis. Marshall fails to address the district court's credibility findings and, therefore, they should not be disturbed. See Nee, 261 F.3d at 84 (holding that credibility findings should not be disturbed unless "after reviewing all of the evidence, [the court] [has] a definite and firm conviction that a mistake has been committed").

Even if Geis did not have actual authority to authorize the search, the evidence need not be suppressed because Officer Hutchins had a reasonable basis for believing that Geis had common authority over the stairway. In Illinois v. Rodriguez, 497 U.S. 177 (1990), the Supreme Court held that the Fourth Amendment is not violated when an officer enters without a warrant because he reasonably, though erroneously, believed that the person who consented to his entry is authorized to do so. Id. at 186. An officer's reliance on a person's apparent authority must be judged against an objective standard: whether a person of reasonable caution with the facts available to him or her would believe the consenting party had authority over the premises. Id. at 186.

At the time of the search, Geis told Officer Hutchins that she rented the *two upstairs bedrooms* to Marshall and Jones. She did not inform him that she considered the stairway and landing part of Marshall's rented space. When Geis asked Officer Hutchins to search the upstairs bedrooms, he told her that he could not conduct a search without a warrant because Marshall and Jones had an expectation of privacy; nevertheless, Geis then asked him to search the stairwell. Because Officer Hutchins had just explained the limitation on his ability to conduct a search, he could reasonably assume that Geis would not have thereafter asked him to search Marshall's private space. Thus, Geis's request for him to walk up the staircase, under these circumstances, would have given a reasonable person the impression that she had common authority over this area.

Finally, although Officer Hutchins did not act reasonably in stepping inside the open door to the bedroom, his brief entry into the room was insignificant. As the district court noted, Officer Hutchins already had probable cause to search based on Geis's statements and what he observed from outside the door. Moreover, the information obtained from his search was never conveyed to Jones and did not play a role in obtaining her later consent to search the rooms. See United States v. Maldonado-Espinosa, 968 F.2d 101, 103-04 (1st Cir. 1992).

## B. Consent to Search the Apartment

Marshall also challenges the district court's finding that Jones's consent was freely and voluntarily given. Proof of valid consent requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given. United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000). Whether consent was voluntary or the result of coercion is a question of fact to be determined from an examination of the totality of circumstances. United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989) (citation omitted). Factors to be considered include age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics. Id. at 51.

The officers testified that Jones freely consented both verbally and in writing after the consent to search form was read to her in its entirety. Furthermore, they testified that Jones was repeatedly informed of her right to refuse consent. Conversely, Jones testified that her consent was obtained through threats and coercion. She stated that she was denied access to her home and was forced to sit in her car while the officers secured her home, was intentionally frightened into believing that she would be arrested in front of her children if she did not consent, and was told that the officers would search the rooms even if she did not consent because they were going to get a search warrant. The

district court credited the officers' testimony and specifically discredited Jones's testimony, concluding that Jones lied to protect Marshall. In the absence of a reason not to do so, this court defers to the district court's personal observations and evaluation of the witnesses' credibility. See Perez-Montanez, 202 F.3d at 438.

Even if Jones's testimony is to be believed, the district court's finding of no coercion survives this court's review. Although Jones was not permitted to enter her home while the officers were present, she was not placed in custody or restrained in any way. Her testimony that the officers told her that she *could* stay implies that she realized that she was free to leave. Moreover, the fact that the officers told her that they were going to search the apartment regardless of whether she consented because they intended to get a warrant is not inherently coercive. Probable cause had been established and the officers had a good faith belief that a warrant would issue. See Twomey, 884 F.2d at 52. But See Bumper v. North Carolina, 391 U.S. 543 (1968) (holding that consent was not voluntarily given where the officers indicated that they already had a warrant to imply that resisting consent would be futile).

## C. Scope of the Search

Marshall next argues that, regardless of whether Jones's consent was voluntary, the officers' search of the videotapes

exceeded the scope of her consent. The district court concluded that viewing the videotapes reasonably fell within the scope of the consent since video equipment was listed among the stolen items. The circuits are divided on the question of the appropriate standard of review regarding questions of the scope of consent and this circuit has yet to rule on the matter. United States v. Melendez, 301 F.3d 27, 32 (1st Cir. 2002) (noting that the Fifth Circuit reviews *de novo* and the Eighth Circuit reviews for clear error).

Warrantless searches may not exceed the scope of the consent given. The scope of consent is measured by a test of objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and subject?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). "[Courts] therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." Melendez, 301 F.3d at 32 (citation omitted).

The scope of a warrantless, but consensual, search is generally defined by its expressed object. Jimeno, 500 U.S. at 251. In the instant case, Jones was told that the purpose of the search was to look for stolen items and evidence showing Marshall's involvement in a recent burglary. The consent form she signed gave the officers permission to "take from my premises any property, any

letters, papers, material to any other property or things which they desire as evidence for criminal prosecution in the case or cases under investigation." Thus, the question is whether a reasonable person would conclude that the videotapes were within the "expressed object" of the intended search.

Marshall contends that an objective observer would not have concluded that Jones consented to the seizure or viewing of the videotapes. First, he argues that the tapes were not among items reported stolen and Jones did not authorize a search or seizure of the tapes. Jones testified that she presumed that the search would be limited to the box of stolen items that she pointed out to the police and stated that she did not believe that she was consenting to a search of items that she knew not to be stolen. Second, Marshall argues that it was unreasonable for the officers to believe that the tapes could have provided additional evidence of the burglary since they would not have fit into the video equipment/camcorders that were stolen.[1]

Although videotapes were not reported stolen, this is not a case where the items seized are wholly unrelated to the expressed object of the search. See United States v. Turner, 169 F.3d 84, 88 (1st Cir. 1999) (holding that seized computer files containing child pornography fell outside the expressed object of the search – to gather concrete, physical evidence of an assault – because

---

[1]The stolen equipment uses 8mm tape, rather than VHS tapes.

physical evidence would not be found on a computer).  Nor is this a case where the officers' lawful search was a pretext for otherwise unlawful aspects of a search.  See generally United States v. Hamie, 165 F.3d 80, 84 (1st Cir. 1999) (citing United States v. Foster, 100 F.3d 846 (10th Cir. 1996); United States v. Young, 877 F.2d 1099 (1st Cir. 1989); and United States v. Rettig, 589 F.2d 418 (9th Cir. 1978)).  Rather, Officers Hutchins and Stevens viewed the videotapes to see if they contained home movies of the burglary victims and to narrow down the number of items seized.[2]  As video equipment was among the items reported stolen, and home videos of the victims would have provided evidence of Marshall's involvement in the burglary, the videotapes reasonably fall within the expressed object of the search.

That Jones testified, after the fact, that she believed the search was limited to the items reported stolen or those contained in the box is of no consequence.  The standard for measuring the scope of a search is one of objective reasonableness, not the consenting party's subjective belief.  For sure, a consenting party may limit the scope of his or her consent or withdraw it altogether.  Jimeno, 500 U.S. at 252.  However, where consent is given and is reasonably understood to extend to a particular item,

---

[2]While Marshall argues that this reason is pretense because Officer Stevens did not have familiarity with the burglary victims, the government retorts that "the officers were personally familiar with the victims of the recent burglary and would certainly recognize them were they depicted on the tape."

-13-

the Fourth Amendment does not require a more explicit authorization. Id. Here, Jones consented in writing to a search that clearly encompassed any property related to the burglary. As such, a reasonable observer would conclude that the search could extend beyond the mere items stolen so long as they were reasonably calculated to produce evidence linking Marshall to the recent burglary.

Furthermore, the fact that the officers were mistaken in their belief that the tapes could be related to the stolen equipment does not render their search unconstitutional. "The touchstone of the Fourth Amendment is reasonableness." Id. at 250 (citation omitted). Hence, the Fourth Amendment does not require officers to be correct in their assessment of the facts; it only requires that they be reasonable. Rodriguez, 497 U.S. at 184 (discussing the reasonableness requirement as applied to different factual scenarios). Here, the officers were mistaken in their belief that the videotapes might somehow be linked to the stolen equipment or lead to evidence relevant to the burglary. Their belief, while clearly mistaken, was not unreasonable.

Marshall also argues that, even if the officers had authority to seize the tapes, they were obligated to get a warrant before they viewed their contents because he had an expectation of privacy and there were no circumstances that justified the officers' warrantless search. In support of his argument, Marshall relies on

-14-

<u>United States</u> v. <u>Chadwick</u>, 433 U.S. 1 (1977), and <u>Walter</u> v. <u>United States</u>, 447 U.S. 649 (1980). In <u>Chadwick</u>, the Supreme Court held that a warrantless search of a locked footlocker in the exclusive possession of government officers violated the Fourth Amendment. The officers in <u>Chadwick</u> arrested several individuals who were seen carrying a footlocker that was reported to have been leaking talcum powder, a substance commonly used to hide the smell of marijuana, after sniffing dogs alerted the officers to the presence of a controlled substance inside. <u>Id.</u> at 3-4. Following the arrest, law enforcement officers opened the locked trunk and discovered drugs. In ruling on the defendants' motion to suppress, the Court held that, once the officers had the container in their exclusive control, they were required to get a search warrant since it was no longer a search incident to an arrest and none of the other exceptions to the warrant requirement existed. <u>Id.</u> at 15-16. The Court reasoned that "[b]y placing personal effects inside a double-locked footlocker, [the defendants] manifested an expectation that the contents would remain free from public examination." <u>Id.</u> at 11. Similarly, in <u>Walter</u>, the Supreme Court ruled that lawful possession of films did not give law enforcement officials authority to view the films. In that case, law enforcement officers viewed several obscene films that were mistakenly delivered to a third party rather than the consignee. Although probable cause was established by the outside packaging suggesting

-15-

illicit contents, the Court nevertheless ruled that the warrantless viewing of the films constituted an unlawful search since none of the exceptions to the warrant requirement existed. 447 U.S. at 654.

As the prosecution argues, however, both Chadwick and Walter are distinguishable from the present case. Neither the owner of the footlocker in Chadwick nor the owner of the films in Walter consented to a search. Here, Marshall's girlfriend consented to a search of the rented bedrooms that was broad enough to encompass the videotapes. Although Jones does not claim ownership over the tapes, she had apparent authority to consent to their search since she had regular access to them. The tapes were not kept in a separate area where Jones lacked access or control over them. As a consequence, Marshall has a lessened expectation of privacy in their contents as compared to the defendants in Chadwick and Walter.

The government contends that United States v. Jenkins, 46 F.3d 447 (5th Cir. 1995), is applicable to this case. In Jenkins, the Court of Appeals for the Fifth Circuit upheld a warrantless search of a shipment of illicit videotapes where the store clerk, who had regular access to the tapes when he unpacked them at the owner's request, cooperated with FBI agents by allowing them to view the tapes. Id. at 457-58. The court reasoned that the store clerk not only had lawful possession of the tapes, but also had apparent

authority to view the tapes via his regular access to them at work. Id. at 458. As a consequence, the court found that the defendant store owner could not have had a reasonable expectation of privacy as to their contents and assumed the risk that his clerk would watch the videotapes and allow others to do so. Id. at 459.

Although Jones did not explicitly consent to a search of the videotapes as did the store clerk in Jenkins, much of the court's reasoning in that case is applicable. Jones's access to the videotapes suggests that Marshall, like the store owner in Jenkins, assumed the risk that she might view the tapes herself or allow others to do so. Thus, as Jones's broad consent encompassed the videotapes, her consent was similarly sufficient to overcome any additional warrant requirement.

**D. Questioning of the Witnesses from the Bench**

Finally, Marshall contends that the district court prejudiced his case and displayed improper bias by rehabilitating certain government witnesses and asking leading questions from the bench at the suppression hearing.

However, the record does not contain a transcript or excerpts of the suppression hearing. Thus, this court is unable to determine whether any improper questioning occurred. Therefore, although the issue was raised, it is waived.

-17-

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is **affirmed.**